IN THE UNITED STATES BDISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SED HOLDINGS, LLC,                          §
                                            §
V.                                          §       CIVIL ACTION NO. 4:17-CV-01655
                                            §
3 STAR PROPERTIES, LLC, ET AL.              §

## SED HOLDINGS, LLC'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**TO THE HONORABLE VANESSA D. GILMORE:**

SED Holdings, LLC ("SED") hereby files its Second Amended Complaint against 3 Star

Properties, LLC, James Johnson, Biltmore Funding, LLC, TM Property Solutions, LLC, TMPS,

LLC, Mark Hyland, Home Servicing, LLC, Charles A. Brown & Associates, PLLC d/b/a

DocSolution, Inc., Mark E. Dykes, George G. Caballero, Don St. John and Howard L. Nations, a

Professional Corporation also known as The Nations Law Firm, as follows:

## I.
## PARTIES AND JURISDICTION

1.     Plaintiff SED Holdings, LLC ("SED") is a North Carolina corporation with its

principal place of business in Durham County, North Carolina.

2.     Defendant 3 Star Properties, LLC ("3 Star") is the Debtor in Bankruptcy Case No.

16-34815 and has appeared in this lawsuit.  A true and correct copy of this Amended Complaint

will be served on Janet S. Northrup, Chapter 7 Trustee for Debtor 3 Star in Bankruptcy Case No.

16-34815, via e-filing service by and through her counsel of record:  Hughes Watters Askanase,

LLP c/o Rhonda R. Chandler, 1201 Louisiana, Ste. 2800, Houston, TX  77002.

3.     Upon information and belief, Defendant James P. Johnson ("Johnson") is a citizen

and resident of Buncombe County, North Carolina who has appeared in this lawsuit.  A true and

correct copy of this Amended Complaint will be served on Johnson via e-filing service by and

through his attorney of record:  Law Offices of Hayes Hofler, P.A. c/o R. Hayes Hofler, III, 1007 Vickers Ave., Durham, NC  27707 as well as via certified mail, return receipt requested and/or hand delivery to Johnson at his dwelling house at 2120 Doug's Way, Heiskell, TN  37754.

4.      Defendant TM Property Solutions, LLC ("TM Property") is a limited liability company organized under the laws of Texas that has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on TM Property via e-filing service by and through its attorneys of record.

TM Property carried out its business through its principal and managing member Mark Hyland.

5.      Defendant TMPS LLC ("TMPS") is a limited liability company organized under the laws of Texas that has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on TMPS via e-filing service by and through its attorneys of record. TMPS acted through Hyland as alleged below, and all allegations against Hyland are both in his personal capacity and in his capacity as managing member of TMPS.[1]

6.      Defendant Biltmore Funding, LLC ("Biltmore") is a limited liability company organized under the laws of Texas that has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on Biltmore via e-filing service by and through its attorneys of record.  Biltmore carried out its business through its principal and managing member Mark Hyland.

---

[1]     Charles A. Brown & Associates, PLLC d/b/a DocSolution, Inc. filed an Interpleader Petition in the removed Harris County case on October 28, 2015 that identified TMPS, LLC a/k/a TM Property Solutions, LLC as a proper party.  At no time did TMPS, LLC or TM Property Solutions, LLC dispute the characterization that Hyland used these two names interchangeably.  Likewise, a separate Interpleader action was initiated by Charles A. Brown & Associates, PLLC on February 16, 2016 in Harris County that identified the proper party as TMPS, LLC also known as TM Property Solutions, LLC.

7.　　　Defendant Mark Hyland ("Hyland") is a citizen and resident of League City, Texas who has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on Hyland via e-filing service by and through his attorneys of record.

8.　　　Defendant Home Servicing, LLC ("Home Servicing") is a limited liability company organized under the laws of Louisiana that has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on Home Servicing via e-filing service by and through its attorneys of record. Home Servicing carried out its business through its principals, officers, employees and/or agents, Caballero and St. John.  Home Servicing is liable for the actions and/or omissions of Caballero and St. John, its principals, officers, employees and/or agents.

9.　　　Charles A. Brown & Associates, PLLC d/b/a DocSolution, Inc. ("Brown & Associates") is a professional limited liability company organized under the laws of Texas that has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on Brown & Associates via e-filing service by and through its attorneys of record.

10.　　　Mark E. Dykes ("Dykes"), a licensed Texas attorney, employed and/or associated and/or affiliated with The Nations Law Firm, served as the Escrow Agent for the SED/3 Star transaction at issue herein, amongst others.   A true and correct copy of this Amended Complaint will be served on Dykes via e-filing service by and through his attorneys of record.

11.　　　George G. Caballero ("Caballero"), a principal of Home Servicing, is an individual residing in East Baton Rouge Parish, Louisiana, who has appeared in this lawsuit.  A true and correct copy of this Amended Complaint will be served on Caballero via e-filing service by and through his attorneys of record.

12.　　　Don St. John ("St. John"), a principal of Home Servicing, is an individual residing in either Riviera Beach, Florida or East Baton Rouge Parish, Louisiana, who has appeared in this

lawsuit. A true and correct copy of this Amended Complaint will be served on St. John via e-filing service by and through his attorneys of record.

13.     Howard L. Nations, a Professional Corporation, also known as The Nations Law Firm, hereinafter referred to as "The Nations Law Firm", is a Texas Professional Corporation with its principal office located at 3131 Briarpark Dr., Suite 208, Houston, Texas 77042, and may be served with process by serving its registered agent and President, Howard L. Nations, at his place of business, The Nations Law Firm, 3131 Briarpark Dr., Suite 208, Houston, Texas 77042, or wherever else he may be found. Insofar as the matters at issue in this lawsuit, The Nations Law Firm carried out its business through its employee and/or agent, Dykes. The Nations Law Firm is liable for the actions and/or omissions of Dykes, its employee and/or agent.

14.     Statement Regarding Jurisdiction.    The adversary proceeding in this case was removed to the United States Bankruptcy Court for the Southern District of Texas from the state courts of Texas and North Carolina and the bankruptcy reference was withdrawn by this Court pursuant to that Order Regarding SED Holdings, LLC's Motion to Withdraw the Reference entered on May 31, 2017. This Court holds jurisdiction under 28 U.S.C. §§ 157 and 1334. Plaintiff does not consent to entry of final orders or judgment by the Bankruptcy Court in the adversary proceeding.

## II.
## JURY DEMAND

15.     SED demands a trial by jury on all issues and causes of action so triable.

### III.
### FACTS UNDERLYING DISPUTE

**THE LONG CON: THE ABBREVIATED VERSION**

16.     On June 20, 2014, 3 Star and SED entered into the Loan Sale Agreement ("LSA"), a copy of which is attached hereto and marked as **Exhibit A**.  Generally speaking, by virtue of this LSA, SED was acquiring 1235 non-performing loans from 3 Star for $13,880,171 ($4,000,000 of which was paid up front).  Unbeknownst to SED, it actually purchased a bunch of empty file folders, loans that had been released long before and loans that were not owned free and clear by 3 Star.  This is SED's action against Defendants who worked in concert to defraud SED.  Using 3 Star as a shell company, Defendants designed and executed a scheme to secure cash payments of $4,000,000 from SED while maintaining control over the loans leaving SED with nothing. Beginning in early 2014, Defendants maintained a close alliance in support of the conspiracy.  The close alliance has now begun to break down as TM Property and Biltmore, through the person of Defendant Mark Hyland, comes to this Honorable Court seeking Court approval to keep SED's $4,000,000 (that was illegally funneled to him and his entities) and the cash proceeds from the Trustee's sale of the loans.  The Con is on – but it cannot be completed without this Court's blessing.   These claims endeavor to do nothing more than disallow the judicial blessing of this Long Con.

#### MARK HYLAND CONTROLLED THE ASSETS AND WAS THE ARCHITECT OF THE FRAUD

17.     Hyland, acting through TM Property, TMPS and Biltmore, was the architect of the scheme to defraud SED ("Con") out of more than $4,000,000.  At all times Hyland was working on behalf of TM Property, TMPS and Biltmore and controlled the assets at issue in this lawsuit. Hyland and Johnson (3 Star's managing member) worked together as business partners to market the assets to SED, make necessary representations about the proposed transaction, provide

preliminary information prior to signing the loan sale documents, and met with SED in an effort to carry out the Con.

18.     As part of the Con, Hyland worked with business partners and/or business associates to control every aspect of the SED transaction.  The list of business partners and/or business associates includes, but is not limited to, Home Servicing, Don St. John, George Caballero, Greg Wright, Mark Dykes and Brown & Associates.

19.     The Con had two basic components: (1) through misrepresentations, fraudulently induce SED to sign the LSA and pay $4,000,000 in up-front money for the direct benefit of Hyland and his entities and (2) Hyland, and his cronies, dupe SED to cover up the fraudulent misrepresentations made in the LSA and manufacture a claim for breach of the LSA against SED, all the while running out the clock on SED with respect to the put-back provisions of the LSA.

20.     Hyland, through Johnson/3 Star, required the use of the document custodian, Brown & Associates, a company that had possession of the 1235 loans.

21.     Hyland, through Johnson/3 Star, required the use of the servicing company, Home Servicing, a company that serviced the 1235 loans and held SED's funds in trust.  The principal(s) of Home Servicing is also a partner with Hyland in Biltmore.

22.     Hyland, through Johnson, required the use of an escrow agent, "Mark E. Dykes, Attorney at Law, Law Offices of Howard L. Nations, P.C." also referred to in the LSA as "Mark Dykes at [The] Nations Law Firm" and "Mark Dykes of Nations Law", a partner with Hyland and the same escrow agent involved in all of Hyland's related transactions concerning the Subject Loans.  Mark Dykes also provided significant input into the drafting of the LSA (which identified him and The Nations Law Firm as escrow agent for the underlying transactions concerning the

Subject Loans). The Nations Law Firm is vicariously liable for the acts and/or omissions of Dykes per respondeat superior and/or principal/agent liability.

23.     On December 1, 2014, SED filed suit in Durham County, North Carolina, Case Number 14 CVS 5766 ("North Carolina Action") against Hyland, Johnson, 3 Star, Home Servicing and Hyland's controlling entity TMPS, LLC seeking redress for breach of the LSA and the related fraud.

24.     In the North Carolina Action, Hyland executed an affidavit on December 13, 2015 that stated he was the managing member of TMPS, LLC and that *"[u]nder a bulk sale arrangement with"* 3 Star, TMPS, LLC *"and its subsidiaries or related entities sold 1235 nonperforming loan assets to 3 Star, subject to terms and conditions of a promissory note and security agreement."* *See* December 13, 2015 Affidavit of Mark Hyland, attached hereto as **Exhibit B** and incorporated into this Complaint by reference.

25.     Hyland further swore that he authorized the sale by 3 Star to SED so long as the proceeds were paid to TMPS, LLC. *Id.* Later, in sworn deposition testimony elicited by SED on October 16, 2016, Hyland then disclosed—for the first time—that a majority of the $4,000,000 paid by SED to 3 Star was actually funneled through Mark Dykes of Nations Law, to the following three entities: (1) $1,625,000 to Biltmore; (2) $760,000 to TM Property; and (3) 1,500,000 to Biltmore II.

26.     On September 15, 2016, Hyland swore up a second affidavit in the North Carolina Action. In this second affidavit, Hyland swears that he is *"a member and managing director of TM Property Solutions, LLC. TM Property Solutions, LLC is a member of Biltmore Funding, LLC. I am also a member of DFI-OTH, LLC which is a member of Biltmore Funding II, LLC . . ."* In other words, Hyland finally revealed that he was in charge of TM Property, that TM Property was

7

a member of Biltmore Funding, and that he was member of Biltmore II.  To be clear, in one moment of candor, Hyland disclosed that he was a member of and/or controlled all of the entities that actually received the $4,000,000 SED paid to 3 Star.  *See* September 15, 2016 Affidavit of Mark Hyland, attached hereto as **Exhibit C** and incorporated into this Complaint by reference.

27.     In this second Affidavit, Hyland again repeated that TMPS was a proper party to the North Carolina Action when he stated "*that it was then the intent of 3 Star to purchase from TM Property Solutions, LLC, Biltmore Funding, LLC and Biltmore Funding II, LLC (collectively herein for purposes of this Affidavit only sometimes referred to as 'TMPS'), a total of 1235 non-performing loan assets (the 'Assets') under a bulk sale arrangement so that 3 Star could 'flip' or almost immediately sell the Assets to SED Holdings, LLC ('SED') for cash. . . [However] it was permissible for 3 Star to sell the Assets [only] so long as the proceeds were paid to TMPS.*" *Id.*

28.     The initial plan of Hyland was to use Johnson/3 Star to sell the 1235 assets for cash by making multiple misrepresentations to SED as well as for Hyland to secrete as much information as he could about the true facts surrounding the transaction.  3 Star was nothing more than a pass through entity being used to "flip" the assets for cash while concealing the true owners of the assets (TM Property, Biltmore and Biltmore II).  As the Con goes, this would allow Hyland's entities to enjoy the cash payments made by SED while 3 Star (who actually owned nothing) would take the blame (and shoulder the contractual liability).  However, SED complicated the Con when it became apparent that SED was only willing to pay $4,000,000 cash up front.

29.     Hyland provided Johnson/3 Star with a sales agreement he had used in the past and Hyland/Johnson/3 Star created multiple Loan Sale Agreements, Security Agreements and Promissory Notes to paper the transactions: because 3 Star actually owned nothing,

8

notwithstanding its representations to SED that it was the single, solitary owner of all 1235 loans, 3 Star had to procure the 1235 loans from Hyland's entities.

30.     These loans were purchased by Hyland and his entities for pennies on the dollar because many of the assets were incomplete.  Hyland knew the assets were incomplete and, despite this knowledge, worked with Johnson/3 Star to market the loans to SED as complete and secured by real property.  For example, a portion of the loans conveyed to SED in the LSA were previously purchased by Biltmore II (one of Hyland's entities) in December 2013.  These loans were purchased for 5 cents on the dollar of the unpaid principal balance because the loans were the equivalent of credit card debt.  Hyland knew these loans were incomplete, comprised of many empty files and Hyland told the managing member of Biltmore II that he would have to "reconstruct the collateral files" after the sale.  Despite this knowledge, the loans were represented to SED to be complete, owned by 3 Star, and ready for foreclosure if necessary.  None of this was true.

### MISREPRESENTATIONS MADE TO SED TO INDUCE THE CONTRACT AND THE PAYMENTS

31.     In May of 2014, SED representative Chris Edens ("Edens") was introduced to Johnson.  After this introduction, Edens, fellow SED representatives James Dever ("Dever") and Vance Syphers ("Syphers"), and Johnson began discussing the possibility of 3 Star selling to SED a pool of loans.

32.     The information provided to SED by Johnson came directly from Hyland.  Hyland worked with Johnson to market the sale of 1235 loans to SED, and in so doing, Hyland provided Johnson with a list of loans that he controlled and other information for the purpose of inducing SED to enter the LSA.

9

33.     Over the next month, SED negotiated with Johnson over the sale of a pool of loans, and by extension Hyland and his related entities.  During those discussions, SED made clear that the loan files needed to be in good shape, meaning that the property could be foreclosed upon based on the existing documents in the file.

34.     During those negotiations, Johnson and 3 Star, and by extension Hyland and his related entities, assured SED again and again that the files were in good shape and were at least as good as the industry standard for such transactions.  For example, in an email dated May 12, 2014, Johnson represented that assets were "Fresh", were valuable assets, and were ready to be sold immediately: **"The price I'm asking will also allow you to sell pools as they are - divided up geographically by state or region, or sell out in small 5 - 20 asset pools to small buyers - who then have lots of room to pursue the above strategies to make their profit."** *See* May 12, 2014 email, attached hereto and marked as **Exhibit D**.

35.     Not only were the representations false but 3 Star was not the owner of any of the 1235 loans during the negotiations.  Hyland and Johnson knew that many of the loans—that at that point in time were not even owned by 3 Star—were incomplete and not saleable.

36.     3 Star/Johnson and Hyland were working together to sell the loans to SED by attempting to use 3 Star as a pass through entity for the sale of the 1235 loans thereby hiding the true owner of the loans.  In this regard, Hyland confirmed that 3 Star never performed any of its own due diligence on the loans sold to SED.

37.     The 1235 loans marketed by Hyland and 3 Star were actually owned by three different entities: (1) approximately 500 loans owned by Biltmore II a/k/a TM 37; (2) approximately 450 loans owned by Biltmore a/k/a TM 28; and (3) approximately 300 loans owned by TM Property.

10

38.     On June 3, 2014, representatives of SED (Edens, Dever, and Syphers) met with Johnson at a hotel in Asheville to negotiate the sale of the loans that were described in the LSA. The following representations were made to SED about the 1235 loans in the LSA: (i) the loans were secured by real property; (ii) the loans were owned by 3 Star; (iii) 3 Star was in possession of documents that established ownership and title; and (iv) the loans were in good shape, meaning that the property could be foreclosed upon based on the *existing* documents in the file and that SED could then properly (and honestly) sell the loans to retail purchasers.

39.     Based on representations, the parties agreed to a sale whereby SED would make an almost immediate payment of $4,000,000 to 3 Star and the balance would be paid out over time pursuant to a Note.

40.     3 Star notified Hyland, TM Property and Biltmore of the proposed terms with SED, including the structure of the payments and the need to sign a Promissory Note for the sale balance over $4,000,000.  Hyland, acting on behalf of TM Property and Biltmore, worked with 3 Star to structure the related sale agreements between TM Property and Biltmore to mirror the SED transaction with the understanding that a large portion of the $4,000,000 would, completely unbeknownst to SED, immediately be paid to TM Property and Biltmore to fund those transactions.

41.     During this period of time, Hyland and his related entities (TM Property and Biltmore) knew that 3 Star had no assets, could not pay any of the required money to fund the transactions and treated 3 Star as nothing more than a shell company used for pass through purposes.

42.     At the meeting on June 3, 2014, the parties discussed the use of third party vendors. SED wanted to use the third party validation company Richmond Monroe Group to inspect, cure,

and act as the custodian of the loan files immediately following the closing.  3 Star insisted on the use of Brown & Associates instead of the Richmond Monroe Group because the files were already with Brown & Associates.  Hyland and Johnson did not want the files leaving Brown & Associates because they wanted to control the transaction and run out the clock on the put back period set forth in the LSA.

43.     Shortly after the meeting on June 3, 2014, Hyland and Johnson contacted Regina Monts at Brown & Associates to inform the document custodian that a sale was in place to transfer the assets to SED via 3 Star.

44.     On June 20, 2014, SED and 3 Star entered into the LSA.  SED's acceptance was obtained through fraudulent misrepresentations.  Hyland, TM Property and Biltmore worked with 3 Star on the terms of the fraudulent LSA.

45.     The LSA provided that SED would purchase the 1,235 loans for a total price of $13,880,171.  That amount would be paid as follows: (1) $2,000,000 at closing, $300,000 of which came from an earnest money deposit; (2) $2,000,000 on or before July 11, 2014; and (3) the balance through a note issued in favor of 3 Star by SED ("the Note").  The purchase price was based on 19.5% of the total unpaid principal balance for all of the 1235 loans.

46.     The LSA also provided that servicing of the 1235 loans would be handled by Home Servicing.  Home Servicing was the prior servicer of the 1235 loans, worked with Hyland, TMPS and Biltmore to sell the 1235 loans to SED, knew many of the loans were incomplete (not saleable), and had full knowledge of the true owner of the 1235 loans (that is, not 3 Star).  Upon information and belief, Home Servicing and or its principals are partners of Hyland in Biltmore.

47.     The LSA also provided that Brown & Associates would be used to inspect, cure, and act as the custodian of the 1235 loans.  Brown & Associates was the prior document custodian,

worked with Hyland, TMPS, Biltmore Funding and Biltmore Funding II to cure the 1235 loans, knew many of the loans were incomplete (not saleable), and Brown & Associates had information about the identity of the true owners.  Brown & Associates failed to disclose to SED its prior relationship with Hyland, TM Property, Biltmore, and Biltmore II.

48.     3 Star through Johnson and Hyland demanded that SED continue to use Brown & Associates and Home Servicing because those entities were affiliated with TM Property/Biltmore and because Defendants could control the flow of information to SED.

### MISREPRESENTATIONS MADE UNDER THE LSA REGARDING OWNERSHIP OF THE LOANS

49.     Under the LSA dated June 20, 2014, 3 Star represented to SED that the loans were solely owned by 3 Star and that 3 Star was in possession of documents that established ownership and title.  This was not true.  None of the assets sold to SED under the LSA were solely owned by 3 Star.

50.     Hyland and Johnson worked together to conceal this misrepresentation by, among other things, delaying access to the 1235 loans held by Brown & Associates.

51.     Hyland, as the architect of the fraud, was only able to transfer one pool of assets to 3 Star on or before June 20, 2014, the effective date of the LSA because SED paid only $2,000,000 cash at that time – the Biltmore pool.  Simply put, Hyland orchestrated the transactions between 3 Star and his related entities that owned the underlying 1235 loans (TM Property, Biltmore and Biltmore II) so that as SED paid cash to 3 Star, that cash was immediately funneled by Mark Dykes at The Nations Law Firm to the 3 Hyland entities that actually owned the 1235 loans to satisfy the purported debt owed by 3 Star to the Hyland entities for the right to purchase those loans and transfer them to the clueless SED.  Consequently, the other transfers (from Biltmore II and TM Property) could not take place because 3 Star had only separated SED from $2,000,000.  Hyland,

in a move only a skilled con artist could appreciate, was tracking the SED funds and set up the other transactions to match not only the terms of the LSA, but the timing of payments made under the LSA.

52.     More specifically, on June 20, 2014, the same date as the LSA between SED and 3 Star was executed, 3 Star as the buyer and Biltmore as the seller executed a similar loan sale agreement governing the sale of approximately 450 of the 1235 loans sold to SED.  *See* June 20, 2014 Loan Sale Agreement between 3 Star and Biltmore, hereinafter referred to as the "3 Star/Biltmore LSA", attached hereto and marked as **Exhibit E**.  Johnson signed on behalf of 3 Star and Hyland signed on behalf of Biltmore Funding, LLC.  *Id.*

53.     Pursuant to the 3 Star/Biltmore LSA, $1,625,000 of the initial $2,000,000 payment made by SED to 3 Star was immediately funneled to Biltmore to fund the purchase of the approximately 450 of the 1235 assets sold by 3 Star to SED.  Pursuant to 3 Star/Biltmore LSA, 3 Star still owed Biltmore $2,675,000 for the purchase of the loans referenced therein. *Id.*  SED was completely unaware of the 3 Star/Biltmore LSA – having been assured that 3 Star was the single, solitary owner of each and every of the 1235 loans being conveyed to SED, and such loans were completely and totally unencumbered.

54.     These representations that 3 Star was the sole owner of the 1235 loans were also false as evidenced by yet another Loan Sale Agreement executed between 3 Star as the buyer and TM Property as the seller dated July 2, 2014.  *See* July 2, 2014 Loan Sale Agreement between 3 Star and TM Property, hereinafter referred to as "3 Star/TM Property LSA" attached hereto and marked as **Exhibit F**.  Johnson signed on behalf of 3 Star and Hyland signed on behalf of TM Property.  This 3 Star/TM Property LSA called for a closing date of July 14, 2014, the day before Hyland and Johnson allowed SED to inspect the loan files at Brown & Associates.

55.     Prior to the closing of the 3 Star/TM Property LSA (July 14, 2014), SED made a second cash payment of $2,000,000 to 3 Star.  Per the 3 Star/TM Property LSA, $760,000 of this second $2,000,000 from SED was funneled through Mark Dykes at The Nations Law Firm directly to TM Property.

56.     After the LSA was executed by SED, another Loan Sale Agreement was executed between 3 Star as the buyer and Biltmore II as the seller, dated July 9, 2014.  *See* July 9, 2014 Loan Sale Agreement between 3 Star and Biltmore II, hereinafter referred to as "3 Star/Biltmore II LSA" attached hereto and marked as **Exhibit G**.  Johnson signed on behalf of 3 Star, Tim Fleet signed on behalf of Biltmore II and any notices sent pursuant to the contract were to be sent to Hyland.  3 Star did not take possession of the Biltmore II Loans until July 14, 2014 (one day before 3 Star allowed SED to inspect the loan files).  SED was not aware of this transaction.

57.     On or about the date of the LSA with SED, Hyland was working on the Biltmore Funding II sale agreement.  Because Hyland had knowledge of the LSA with SED, he was able to structure the Biltmore II deal to correspond with the payment schedule.

58.     On June 19, 2014, Hyland emailed the managing member of Biltmore II regarding the proposed transaction and stated: "*We will have 100% control of the remaining collateral until the note is paid in full.  100% of all net collections and any sale proceeds will be paid to the Seller note until the note is paid in full.*"

59.     On June 22, 2014, Hyland emailed the managing member of Biltmore II and provided a draft sale agreement for his review.  Hyland informed the managing member of Biltmore II that he "*was able to negotiate a sales price of $4.2M.*"  In reality, there was no purported negotiation as Hyland was acting in essence as a business partner of Johnson/3 Star without the knowledge of the managing member of Biltmore II.  Hyland also notified the managing

member that 3 Star closed on the first pool two days earlier (June 20, 2014) which was the Biltmore transaction.

### MISREPRESENTATIONS MADE UNDER THE LSA REGARDING THE CONDITION OF THE LOANS

60.     The LSA represented that all of the loans were secured by real property.  *See* LSA at p. 1 ("which are secured by real property . . .") and ¶ 6(d).  This was not true.

61.     The LSA represented that the loans were marketable and saleable at the time of the transaction.  Indeed, the "Seller Closing Documents" is defined to include the original Note if in Seller's possession or a Lost Note Affidavit of lost allonge and all intervening assignments including a proper assignment from Seller (3 Star) to Purchaser (SED).  *See* LSA at ¶1(e).  This was not true.  Defendants knew that there were no assignments into 3 Star for any of the loans, and therefore, 3 Star could not provide the required assignments to SED to allow the loans to be sold.

62.     As of the date of the LSA with SED, June 20, 2014, Hyland knew that many of the 1235 files were incomplete, missing or simply not in 3 Star's possession, custody or control.  On June 22, 2014, after the LSA was signed, Hyland notified the managing member of Biltmore II that Greg Wright was working with Home Servicing and Brown on this issue "*and we expect quite a few files coming in this week.*"

63.     Hyland and Johnson worked to delay SED's access to the loan files in order to allow for some of the missing files to be added to the current inventory while having this delay count against SED on the put back provision.

64.     The "put back" provision allowed SED to put back any loan which (i) was not secured by a valid first mortgage, or (ii) had an incurable documentary defect in the applicable files within 45 days or to such reasonable extensions as may be necessary to allow third parties to do their work.  *See* LSA at ¶ 1(g).

65.     After signing the LSA, SED immediately began working—or trying to work—with Brown & Associates and Home Servicing to inspect and, if needed, cure the loan files.  Dever made multiple requests to 3 Star for access to the loan files but 3 Star refused to provide the access or related information until everyone met in person in the middle of July.  Unbeknownst to SED, Hyland and Johnson were working together with Brown & Associates to delay SED's access to the 1235 loan files in order to conceal the ownership and condition of the 1235 loans.

66.     On June 24, 2014 at 8:06 a.m., Johnson emailed Brown & Associates a copy of the signed LSA with SED.

67.     On June 25, 2014 at 10:36 a.m., SED emailed Brown & Associates emphasizing the urgency of the request for services: *"We really need to put a priority on this agreement.  We closed on Monday and need to be sure we have a good handle on which files have original notes or lost note affidavits."*

68.     On June 25, 2014 at 11:07 a.m., Johnson emailed Brown & Associates stating that he sent SED a spreadsheet based on the spreadsheet Hyland had provided Johnson on the loans that were boarded at Home Servicing.  The email further stated: *"Jim knows that there will be adjustments as we go along.  BTW, they have technically 'closed', but they have only paid $2M of $13.5M, so it's not like they have grounds to pressure you or demand anything from you.  They don't even have an account yet."*

69.     On June 25, 2014 at 11:45 a.m., Brown & Associates emailed Hyland: *"Jim Devers is now calling me.  I am having my phone reps take a message for me to call him back until we square away the final list and you guys confirm my directives for this sale as all I have received are directives from Jamie thus far."*

70.     On June 25, 2014 at 12:19 p.m., Hyland emailed Brown & Associates acknowledging the incomplete files and telling Brown & Associates that "*we need to build missing collateral files.*"   Hyland also told Brown & Associates that "*[w]e are not preparing any assignments to Buyer at this point.*"

71.     On June 25, 2014 at 4:57 p.m., Brown & Associates emailed Hyland stating that there was a "*discrepancy*" in the list of assets and that the list provided to Johnson was "*inaccurate and will have quite a few taken out.*"   Moreover, the Brown & Associates email stated: "*I have not and will not take any calls or directive from Jamie until you have confirmed execution of the sales contract between 3 Star and TM.   I have also advised Jamie that because there as 2 sales contracts involved and I need to be able to keep my records straight and provide accountability to my company, I can no longer prepare assignments directly from TM to Jamie's buyer.   I need to provide the appropriate chain of title as pertinent to the sales contracts involved in these sales with 3 Star.*"   Amazingly, SED was not copied on any of these emails and Brown & Associates elected to keep all this information from SED.

72.     The fraud orchestrated by Hyland resulted in the illusion of the transfer of title to SED on June 20, 2014 while Hyland and his related entities withheld assignments.   Hyland confirmed this fraud when he emailed the managing member of Biltmore II on July 1, 2014 and stated: "*We are not giving them any assignments, except for sales, until they have paid at least 60% of the purchase price, not including proceeds from sales.   We will give them assignments for sales, as we are getting 100% of the proceeds and they will need to give assignments to the third party Buyers.*"

**HYLAND AND HIS RELATED ENTITIES WORKED TO DEFRAUD SED BY REMOVING 9 LOANS FROM THE LSA AFTER THE PAYMENT OF APPROXIMATELY $90,000**

73.     With full knowledge of the 1235 loans sold to SED on June 20, 2014, Hyland worked to defraud SED out of $90,000 by removing 9 assets from the 1235 loans purportedly sold to SED.  Hyland worked to allow Biltmore II to retain the 9 loans.

74.     When Biltmore II, agreed to the July 14, 2014 transaction with 3 Star, Biltmore II, LLC specifically withheld nine (9) loans that 3 Star had already purportedly sold to SED for more than $90,000.  Johnson, 3 Star, Hyland, and Brown & Associates knew that loans belonging to Biltmore II had been made part of the fraudulent sale to SED and none of the Defendants notified SED that the nine (9) loans were still owned by Biltmore II.

75.     On August 1, 2014, Hyland notified his business partners and Brown & Associates that the nine loans were retained by Biltmore II despite knowledge that SED had already made payment for those loans.  SED was not aware of the fraud and only later discovered the removal of the nine loans in the summer of 2015.

76.     Despite knowing that the nine (9) loans were still owned by Biltmore II, Brown & Associates billed SED for services rendered on the 9 loans and worked to conceal the fact that the nine (9) loans were never actually included in the 1235 loans SED purportedly purchased from 3 Star.

**DEFENDANTS WORKED TOGETHER TO DEPRIVE SED OF ITS PUT BACK RIGHTS AND CONTINUED THE CON**

77.     As the custodian and document preparation vendor ("Doc Prep Vendor"), Brown & Associates was in possession of loan sale agreements that identified the true owners of the 1235 loans, obtained copies of loan sale agreements executed by Johnson and 3 Star after the sale to SED, and never made any disclosure to SED.

78.     Brown & Associates understood that SED intended on selling the 1235 loans in a short period of time, understood that it was hired to assist SED in preparing the loan files for sale and transfer, understood that SED had a short time frame under the LSA to exercise the "put back" provision of the LSA, and understood the sense of urgency on the part of SED to obtain full and complete information on the status of the 1235 loans.

79.     Brown & Associates had full knowledge of the LSA, agreed to act as the Doc Prep Vendor for SED on the 1235 loans, and agreed to consider SED its client as of the date of the LSA. Unfortunately, as demonstrated below, Brown & Associates failed to treat SED as its client and throughout the process maintained its loyalty to Hyland and his related entities to the detriment of SED.

80.     On July 14, 2014, as arranged by Johnson and Hyland, SED met with Home Servicing and Johnson in Baton Rouge.  Also at the meeting with Home Servicing was Hyland, who represented himself as Johnson's "partner."

81.     Hyland informed Home Servicing that the Loans had been sold to SED and asked Home Servicing to continue to service the loans for the new owner SED.  Home Servicing agreed to service the loans for SED and did so under the existing servicing agreement between Home Servicing and TM Property dated September 23, 2013.

82.     Home Servicing failed to treat SED as its client under the agreement and at all times took instructions from Hyland and Johnson in violation of the agreement.  Home Servicing and its principals worked in concert with Hyland and Johnson to conceal the true facts from SED and acted in such a way as to convince SED that the Defendants were working with SED to help resolve problems with the goal of putting SED in default under the seller note and taking possession of the

loans.  Defendants worked together to use the loans as a funding mechanism for distributing monies to Defendants in the form of payments for services.

83.     On July 15, 2014, SED met with Brown & Associates, Hyland and Johnson for the purpose of discussing the status of the loan files.  Brown & Associates showed a few loan files to Edens, and those loan files were in good shape.  Dever, however, inspected a random sampling of loan files and found them to be deficient.  When Dever told Brown & Associates and Johnson that the files were deficient, Hyland and Johnson told SED that Brown & Associates was receiving more information for the files every day from Freddie Mac, that they were diligently working with the files, and that all files for the loans would all be cured shortly.

84.     On July 28, 2014, Brown & Associates and SED executed an Engagement Letter ("Services Contract") "to provide terms and conditions to govern the provision of services by Brown to SED."  A true and accurate copy of the Services Contract is attached hereto as **Exhibit H**.  SED hired Brown & Associates to secure the necessary documents to assist SED in selling the 1235 loans.

85.     Pursuant to the Services Contract, Brown & Associates agreed to do the following:

a.     "Brown will scan files, review chains of title, prepare, or coordinate and record various mortgage servicing related documents in a workmanlike and professional manner and with a level of skill in the field in which the Services are being provided if requested."

b.     "Brown will have authority to serve as custodian and maintain collateral files in fire resistant legal sized fire cabinets, if asked by SED, at Brown's facility at 2316 Southmore, Pasadena, Texas 77502.  Brown will pull files; Bailee letters, and ship files at customer's request."

86.     In addition to the Services Contract, SED and Brown & Associates entered into a Mutual Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement").  A copy of the Confidentiality Agreement dated July 28, 2014 is attached hereto as **Exhibit I**.

87.     Pursuant to the Confidentiality Agreement, Brown & Associates agreed to do the following:

      a.     Confidential information is defined broadly to include any information relating to the provision of the services to be provided by Brown & Associates, including any written material prepared by either party that contains or is derived from any confidential information.

      b.     Brown & Associates agreed that it shall keep and maintain all confidential information in strict confidence and that it would not use any confidential information for the benefit of anyone other than SED.

      c.     Brown & Associates agreed that it would not circumvent SED in any manner.

      d.     Brown & Associates agreed to defend, indemnify and hold harmless SED from any and all loss, damage, liability, and legal fees resulting from a breach of any obligation contained in the Confidentiality Agreement.

      e.     Brown & Associates agreed, upon a disclosure or threatened disclosure of any confidential information, to a preliminary injunction to protect SED and allow SED to recover the confidential information.

      f.     Brown & Associates agreed, at any time, to return and deliver promptly the confidential information, which includes the original files of the 1235 loans maintained by Brown & Associates.

88.     In order to act as the document custodian, Brown & Associates was required to, and did, agree to all the terms and conditions of the Confidentiality Agreement.

89.     Throughout July, SED worked with Brown & Associates, and did its own fact-finding and analysis, to determine the status of each of the loan files.  On July 24, 2014, Brown &

Associates sent a report regarding the collateral for some of the loans.  Using that report, and its own information, SED sent to Brown & Associates on July 29, 2014 a list of 605 loans that it wanted to put back to 3 Star under the LSA, and it asked Brown & Associates for its full analysis and information about those 605 loans.

90.     On July 31, 2014, Brown & Associates sent SED its audit, containing a full analysis of these 605 "put back" loans.  That audit provided that the 605 put back loans should be put back to 3 Star under paragraph 1.g of the LSA.  The 605 put back loans had either no information in the loan file or insufficient information in the loan file pursuant to paragraph 1.g of the LSA.

91.     On August 1, 2014, within the 45-day period specified in paragraph 1.g of the LSA, SED's attorney James O'Connell sent to Johnson, by email and mail, a notice under paragraph 1.g that SED was exercising its "put back" rights under paragraph 1.g as to the 605 put back loans. Upon information and belief, Johnson provided Hyland with a copy of the put back notice.

92.     No response was provided to the put back letter and the 605 put back loans were properly put back by operation of the LSA.

93.     After receiving the audit from Brown & Associates, and recognizing the horrible and wholly inadequate shape of the loan files, SED continued working with Brown & Associates and began working with another title inspection/cure company, ProTitle, to analyze the loan files. They did so as expeditiously as possible.  As referenced in the LSA, 3 Star had agreed to an extension of the 45-day put back period, for loans beyond the 605 loans already put back, pending such further work: "Seller and Purchaser acknowledge that each shall use third party providers to ascertain and cure any such defects and they agree to such reasonable extensions as may be necessary to allow such third parties to do their work."  LSA ¶ 1.g.

94.     On September 2, 2014, SED received an email from Brown & Associates with a list of 53 loans that were "unavailable" or which loans "have been released." This information was available to Brown & Associates and Hyland well before September 2, 2014 and should have been disclosed to SED in late June or July of 2014.

95.     During this time period (August 2014 to October 2014), Hyland and Johnson continued to assure SED that the loan files could be cured all the while knowing that the strategy was to put SED in default under the terms of the LSA and work on selling the loans to another party.

96.     In violation of the Services Contract and the Confidentiality Agreement, Brown & Associates continued to do work for Biltmore II/Hyland on a portion of the 1235 loans without disclosing this information to SED.

97.     On or about September 21, 2014, 3 Star failed to make the required payment of $1,200,000 to Biltmore II per the 3 Star/Biltmore II LSA and was therefore in default. *See* 3 Star/Biltmore II LSA.  3 Star requested an extension of time to make the required payment and Johnson and Hyland reviewed and approved the Modification Agreement with Biltmore II extending the payment due date until October 20, 2014.  Johnson and Hyland worked together to conceal this information from SED.

98.     On or about September 22, 2014, Biltmore II provided written notice to Brown & Associates that 3 Star was in default of the 3 Star/Biltmore II LSA, therefore affecting a portion of the 1235 loans 3 Star sold to SED back in June 2014.  Biltmore II further notified Brown & Associates that no assignments could be delivered on any of its loans without its consent. *See* September 22, 2014 Default Notice, attached hereto as **Exhibit J**. This information was disclosed to Hyland but concealed from SED.

99.     In September 2014, Brown & Associates provided confidential information of SED's (updated collateral report) to Biltmore II/Hyland.

100.    In September or October 2014, SED was working on a sale of assets to a third party that failed to close because Biltmore II refused to give permission to Brown & Associates for the sale.  In violation of the Services Contract and the Confidentiality Agreement, Brown & Associates followed the directions of Biltmore II, failed to disclose this information to SED, and caused harm to SED by the loss of the sale to the third party.

101.    On October 17, 2014, 3 Star sent a notice of default to SED.  *See* October 17, 2014 letter, attached hereto as **Exhibit K**.  This notice falsely claimed that SED had breached the LSA and the Note and demanded full repayment of the Note.  The defaults claimed in the 3 Star letter were false and were an attempt by 3 Star and Hyland to obfuscate their own fraud and was done in anticipation of its own default of the 3 Star/Biltmore II LSA, just three days later.  Importantly, by claiming default, 3 Star was also asserting its alleged right to act as an attorney in fact for SED and invoked its alleged rights to sell the 1235 loans in SED's name.

102.    3 Star failed to make the required payment to Biltmore II by October 20, 2014 and was therefore in default of the 3 Star/Biltmore II LSA.  SED remained unaware of the 3 Star/Biltmore II LSA.

103.    Beginning around October 24, 2014, as the parties were trying to identify the good loans, Hyland communicated directly with SED, on behalf of Hyland/Johnson, with Hyland and SED copying Johnson on all communications and otherwise keeping him informed.   Hyland and SED exchanged many emails and other communications about the loans, in trying to determine the status of the loan files and which loans would be put back to 3 Star per the LSA.

104.    On October 24, 2014, Hyland sent to Syphers, via email, an updated audit of the loans from Brown & Associates.  This audit listed line items for only 1,018 of the 1235 loans. Amazingly, Brown & Associates reported that it had *no information at all* about 217 of the 1235 loans, including no information about who actually owned these 217 loans.  Upon information and belief, Hyland was attempting to further string SED along during this bogus curative process while Hyland and Johnson worked to sell the same loans under the name of SED based on the bogus default letter.

105.    The October 24, 2014 email report from Brown & Associates also revealed that 54 of the loans had been released, meaning that the loans were sold, paid off, or released for other reasons.  The audit revealed that most or all of these 54 loans had been released <u>before</u> June 20, 2014, meaning that 3 Star and Johnson sold loans that literally did not exist as of the date of sale to SED.  Some of these released loans had even been released years before the LSA was negotiated or signed.

106.    On October 29, 2014, Hyland sent a letter to Orion Financial Group under the letterhead of Biltmore, Biltmore II, and TM Property, all with an address of 2600 S. Shore Blvd, Ste 300, League City, Texas 77573, stating: *"This letter is for the sole purpose of authorizing Orion Financial Group, Inc. to obtain the original or a copy of the Real Estate Mortgage Note(s) on behalf of Biltmore Funding, LLC and Biltmore Funding II, LLC.  A list of loans will be forwarded to you via email.  This will include loans that were originated by various Originators and/or loans that were assigned to FHLMC and subsequently to the Biltmore Group of Companies by other lenders."*  Upon information and belief, Hyland was attempting to obtain copies of documents on the group of loans purportedly sold to SED in June 2014 for the purpose of selling the loans to yet another buyer.

107.     On November 7, 2014, after diligently analyzing and trying to cure the loan files, SED sent to Hyland and Johnson a detailed spreadsheet showing the loans that it was putting back, what SED called in the email the "kick list."   In response, Hyland asked that SED send a spreadsheet with less information—just the property at issue and the reason for the property being put back.  Again, the purpose of Hyland's email was to further delay the matter allowing time for Hyland and Johnson to sell the same assets and retain the proceeds.

108.     On November 11, 2014, SED sent a spreadsheet with the information requested by Hyland. *See* November 11, 2014 spreadsheet, attached hereto as **Exhibit L**.  The SED spreadsheet listed 1,167 of the loans, including the 605 put back loans previously identified on August 1, 2014. This communication constituted notification under paragraph 1.g of the LSA that SED was exercising its right to put back these 1,167 loans.  That put back, like the put back from August 1, 2014 was effective under paragraph 1.g of the LSA.

109.     In all, almost 95% of 1235 loans were put back by SED.  For the type of loans at issue here, the industry standard is that somewhere between zero percent and ten percent of loan files sold in such transactions will not have paperwork sufficient to allow the owner of the loan to foreclose on the collateral.

110.     Under the LSA, SED was therefore entitled to a total credit on the Note/refund of $13,602,998.  That amount is more than the outstanding balance of the Note ($9,880,171), and therefore SED is entitled to a refund, and the Note has a zero balance.

111.     Upon information and belief, as SED later learned, Hyland's related entities bought the loans from a collection agency called URSUS Advisors, which in turn bought the loans from Freddie Mac, which had actually charged off all of the loans.  Upon information and belief, URSUS Advisors either destroyed or did not receive or did not maintain the loan files, and thus

Hyland received loan files that were either non-existent or in horrible shape (not subject to be sold pursuant to the representations made to SED). Hyland, TM Property a/k/a TMPS, LLC, Biltmore, Johnson, and 3 Star knew, or should have known, this before, during, and after June 20, 2014.

112.    Upon information and belief, Hyland and his related entities bought these assets as nothing more than credit card debt with no representations that the assets were secured by real property. Despite receiving on-going information about the poor condition of the assets, Hyland and Johnson repackaged the assets to SED as assets secured by real property thereby increasing the purchase price of the assets from 5 cents to 19.5 cents. Hyland and Johnson knew, or should have known, this was not true and their conduct makes them and their related entities joint tortfeasors in the fraudulent inducement of SED.

### Hyland works with Johnson/3 Star and Brown & Associates to sell assets in the name of SED after the issuance of the bogus default letter

113.    Both before and after the default letter, Hyland and his entities were actively working with Johnson/3 Star to sell assets in the name of SED for the benefit of TM Property and Biltmore.

114.    In September and October, Hyland coordinated the sale of a portion of the loans to various third parties generating payments to TM Property and Biltmore of $256,558.90 and $95,737.32. Upon information and belief, Mark Dykes, of The Nations Law Firm, then distributed these funds to Hyland's affiliates.

115.    On or about November 11, 2014, Brown & Associates received information from Hyland regarding the dispute between SED and 3 Star, Johnson, TMPS, and Hyland. Despite this information, Brown & Associates continued to cooperate and provide information to Defendants on the 1235 loans in violation of the Services Contract and Confidentiality Agreement.

116.    In November, Hyland and Johnson worked together to market and sell assets under the name of SED while concealing this information from SED.  The joint enterprise to sell assets in the name of SED also required the active assistance of both Home Servicing and Brown & Associates   On November 13, 2014, Hyland provided an update to the managing member of Biltmore II regarding one of the sales he was working on with Johnson: "*Attached are the trades Jamie is working on out of this pool.  The total is almost $2MM.  If we can just hang in here just a little while longer, we'll get this done.*"

117.    Later in November, Brown & Associates was notified by counsel for 3 Star that SED was purportedly in default to 3 Star.  Brown & Associates failed to investigate the purported basis of the default, failed to discuss the matter with SED, and instead took instructions from Johnson and Hyland on the 1235 loans in violation of the Services Contract and Confidentiality Agreement.

118.    On December 1, 2014, SED filed the North Carolina Action against Defendants 3 Star, Johnson, TMPS, Hyland, and Home Servicing.  Brown & Associates became aware of the lawsuit in December and continued to cooperate with the Defendants, providing a statement to be used by Defendants against SED.

119.    In December 2014, following the filing of the North Carolina Action, Hyland worked with Johnson to market and sell assets in the name of SED to an entity by the name of ABC.  In a tense exchange, the managing member of Biltmore II complained that "*[n]ot one loan sale that you have said will be closing has come through.*"  In response, Hyland stated: "*Except for the 1.5MM we got . . .*"  Hyland was referring to SED's $1,500,000 payment funneled to Biltmore II via 3 Star.

120.     On December 10, 2014, Hyland provided the following update to Brown & Associates on the ABC transaction: *"The funds have been received to cover the cost of preparing the chain of assignments to ABC that we discussed yesterday.   Please have the assignments prepared for Ms. Chong at your earliest convenience."*

121.     After receiving information regarding the dispute between SED and the Defendants, Brown & Associates provided updated collateral reports on the 1235 loans to Hyland, Johnson, 3 Star, and TMPS in violation of the Services Contract and Confidentiality Agreement. Moreover, Brown & Associates provided the confidential information of SED to these Defendants to aid in the sale of assets to third parties without the consent and knowledge of SED and to aid these Defendants in preparing for the mediation between the parties in January 2015.

122.     Due to the ongoing fraud by 3 Star, Hyland and others, SED sought and obtained a Temporary Restraining Order ("TRO") in the North Carolina Action.   Pursuant to the TRO, Hyland, TMPS, Johnson, Home Servicing and 3 Star were prohibited from selling, allowing short payoffs of, foreclosing on, transferring, or otherwise making any dispositions of any of the loans sold to SED.  Following the issuance of the TRO, and in clear violation of its unambiguous terms, Hyland continued to work with Johnson and Brown & Associates on the sale to ABC.

123.     On December 22, 2014, Hyland emailed Brown & Associates regarding another sale of SED assets he was coordinating with Wunderlich: *"Attached is the collateral deficiency report and ancillary docs from Wunderlich.  Their comments are below.  Can you please review and let me know if you think these items can be cleared.  They are ready to fund upon completion of the missing items."*

124.     In January 2015, Hyland was also working on yet another proposed sale of the SED assets to Kole Capital Advisors.

125.    On February 13, 2015, a Preliminary Injunction was entered in the North Carolina Action that prohibited Hyland, TMPS, Johnson, Home Servicing and 3 Star from selling, allowing short payoffs of, foreclosing on, transferring, or otherwise making any dispositions of any of the loans sold to SED.

126.    Hyland, TMPS, Johnson and 3 Star, in violation of the Preliminary Injunction were also working with Home Servicing to take payoffs and settle or dispose of loans previously sold to SED thereby profiting from those transactions.

127.    Home Servicing, in violation of the TRO and Preliminary Injunction, paid itself funds out of proceeds from the disposition of the loans sold to SED and from monies collected on the loans sold to SED.

128.    On January 5, 2016, Hyland, TMPS, Johnson, 3 Star and Home Servicing were found to be in willful contempt of the TRO and Preliminary Injunction and a Civil Contempt Order was issued in the North Carolina Action.

### 3 STAR IS ADJUDICATED A FRAUDSTER WITH RESPECT TO THE LSA BY THE HONORABLE FRED DAVIS, DISTRICT COURT OF TARRANT COUNTY, TEXAS, 48TH JUDICIAL DIST.

129.    As 3 Star, Hyland, Johnson, Biltmore and TM Property were violating the Temporary Injunction, Biltmore II filed a lawsuit in Tarrant County, Texas (Cause No. 048-277749-15) seeking a declaration that 3 Star was in default of the 3 Star/Biltmore II LSA affecting a portion of the 1235 loans at issue in the LSA.  On June 13, 2016 after a bench trial before the Honorable Fred Davis, a Final Judgment was entered declaring that 3 Star was a fraudster and that Biltmore II held clear and negotiable title to the collateral (473 of the 1235 loans) free and clear of any claims by or through 3 Star or its assignees.  *See* June 13, 2016 Final Judgment, attached hereto as **Exhibit M**, hereinafter referred to as "Final Judgment."

130.     As to SED, the Final Judgment provided, as a matter of law, that "3 Star attempted to sell assets in which it did not hold any ownership interest, identified as the Collateral in this case, to SED thereby committing fraud on SED." *Id.* The Final Judgment also provided, as a matter of law, that "[a]t no time did 3 Star possess free and clear title to the Collateral, making the purported sales agreement by 3 Star (as the Seller) with SED (as the Purchaser) as to the Collateral void and unenforceable as a matter of law."

131.     The Final Judgment is res judicata in this case as to 3 Star and anyone attempting to stand in the place of 3 Star.

## IV.
## CAUSES OF ACTION

132.     For each and every cause of action sounding in tort contained herein, SED affirmatively pleads and thereby invokes the discovery rule and/or fraudulent concealment to defer the accrual date of each respective statute of limitations.  The tort based causes of action recited below did not accrue until the injuries caused by Defendants became discoverable.  Defendants' wrongful acts and SED's resulting injuries were inherently undiscoverable at the time they occurred.  SED's injuries were by nature unlikely to be discovered within the limitations period despite the exercise of due diligence.  Furthermore, the evidence of SED's injuries is objectively verifiable.  The discovery rule is therefore applicable.

## FIRST CLAIM FOR RELIEF
### (Fraud – Hyland, Johnson, 3 Star, TM Property, TMPS, Biltmore, Home Servicing and Brown & Associates)

133.     All preceding paragraphs are incorporated by reference.

134.     3 Star has been fully and finally adjudicated as a fraudster with respect to the representations it made to SED concerning the LSA.  *See* Final Judgment.

135.    The elements of fraud are: (1) that the speaker made a material misrepresentation; (2) that he knew was false when he made it or that he made recklessly without any knowledge of its truth and as a positive assertion; (3) with the intent that the other party act upon it; (4) that the other party acted in reliance on the misrepresentation; and (5) suffered injury thereby.[2]    A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question."[3]

136.    Defendants, including 3 Star, an adjudicated fraudster, made numerous misrepresentations to SED, to induce SED into executing the LSA, including but not limited to the following:

- "On the applicable closing date, Seller has or will have good title to and is the sole owner and holder of each Loan."  *See* LSA.  Defendants knew this representation was false.   SED relied upon this misrepresentation to its detriment;

-  "Seller owns each Loan free and clear of any ownership, security or participation interest in such Loan and REO in favor of any other person or entity, and has the full right and authority to sell, assign and transfer such Loan and REO to Purchaser pursuant to this Agreement."  *See* LSA.  Defendants knew this representation was false.  SED relied upon this misrepresentation to its detriment.

137.    After execution of the LSA, Defendants made innumerable false representations of material fact while knowing that they were false or while making them recklessly without any knowledge of the truth and as a positive assertion and with the intent and effect of deceiving SED and the intent and effect of SED acting on the representations.

138.    Defendants worked in concert to conceal the flow of information to SED for the purpose of concealing the true nature of the fraud, the true ownership of the loans, the true

---

[2] *Italian Cowboy*, 341 S.W.3d at 337.

[3] *Id.*

condition of the loans and the fact that many of the loans sold to SED had been released long before the sale.

139.    These Defendants deceptively acted in such a way as to convince SED that they were working with SED to help resolve the problems with the underlying loans, all with the goal of putting SED in default under the seller note and taking possession of the assets.

140.    SED reasonably and justifiably relied on the above misrepresentations.

141.    The above false representations damaged SED because SED wasted hundreds of hours of time, and spent hundreds of thousands of dollars on outside consultants to review the loan files, when it would have done neither and put back all of the Loans had it know the true status of the loan files.  Additionally, SED was injured financially because it paid $4,000,000 for nothing. It now has lost its $4,000,000 and does not have a single loan conveyed by the LSA in its possession.

142.    Regarding Hyland and his related entities (TM Property, TMPS and Biltmore), these Defendants misrepresented the state of the loan files in order to induce SED to keep performing under the LSA.  They did so because, upon information and belief, Johnson and 3 Star still owed money to TM Property and Biltmore in connection with the Loans, and thus they desperately needed SED to perform so that they each could get paid hundreds of thousands of dollars.

143.    The Defendants worked together for the common purpose of enriching themselves from the loans purportedly sold to SED and from the payments made by SED for the loans.

## SECOND CLAIM FOR RELIEF
**(Fraud in the Inducement – Hyland, Johnson, 3 Star, TM Property, TMPS and Biltmore)**

144.     All preceding paragraphs are incorporated by reference.

145.     Before execution of the deal documents on June 20, 2014, and in the deal documents themselves, Defendants made many false representations of material fact, while knowing that they were false or while making them recklessly without any knowledge of the truth and as a positive assertion, and with the intent and effect of deceiving SED and the intent and effect of SED acting on the representations. These false representations were made in order to induce SED to sign the deal documents.

146.     SED reasonably and justifiably relied on the above misrepresentations

147.     These false representations constitute fraud in the inducement.  SED was damaged by that fraud in the inducement in that it would not have entered into the LSA but for the false representations and concealments by Defendants.

148.     As a result of the fraud in the inducement, SED is entitled to rescission of the LSA, the Note, and the related deal documents, plus damages to make SED whole.

## THIRD CLAIM FOR RELIEF
**(Fraud by Nondisclosure – Hyland, Johnson, 3 Star, TM Property, TMPS, Biltmore, Home Servicing, Brown & Associates, Dykes, Caballero, St. John and The Nations Law Firm)**

149.     All preceding paragraphs are incorporated by reference.

150.     In the alternative/addition to other counts of fraud, these Defendants committed fraud by nondisclosure.

151.     The elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to

speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge.[4]

152. After execution of the LSA on June 20, 2014, Defendants made many concealments of a past or existing material fact with the intent and effect of deceiving SED.

153. As part of the scheme to defraud, the Defendants hid, for months, the fact that 3 Star owned nothing throughout the negotiations of the LSA, and after negotiations, the loans that were subject to the LSA were incomplete and impaired. These Defendants also hid the fact that 217 loans sold had no files whatsoever. Moreover, Defendants controlled the flow of information to hide the true nature of the fraud, the true ownership of the assets, and incomplete and incurable nature of the assets.

154. With regard to the concealments, Defendants had a duty to speak because they took affirmative steps to conceal material facts from SED, some were fiduciaries of SED, and/or because they had knowledge of latent defects in the subject matter of the contract—the loan files— about which SED was both ignorant and unable to discover through reasonable diligence.

155. The above false concealments damaged SED because SED wasted hundreds of hours of time, and spent hundreds of thousands of dollars on outside consultants to review the loan files, when it would have done neither and put back all of the loans had it know the true status of the loan files. Additionally, SED was injured financially because it paid $4,000,000 for nothing. It now has lost its $4,000,000 and does not have a single loan conveyed by the LSA in its possession.

---

[4] *Bright v. Addison*, 171 S.W.3d 588, 599 (Tex. App.—Dallas 2005, pet. denied).

156.    SED justifiably relied on the Defendants' deliberate silence when they entered into the LSA and continued to work with the Defendants to cure the loans, resulting in significant financial harm.

157.    The Defendants worked together for the common purpose of enriching themselves from the loans purportedly sold to SED and from the payments made by SED for the loans.

### FOURTH CLAIM FOR RELIEF
**(Fraudulent Transfer – 3 Star, TM Property, TMPS, Biltmore, Hyland, Dykes, Home Servicing, Brown & Associates and The Nations Law Firm)**

158.    All preceding paragraphs are incorporated by reference.

159.    In Texas, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor." Uniform Fraudulent Transfer Act ("UFTA"), Tex. Bus. & Com. Code §24.005.

160.    The transfer of SED's $4,000,000 by Dykes in his capacity as a lawyer at The Nations Law Firm to Hyland's affiliates exhibit many of the classic badges of fraud expressly outlined in TUFTA:

- the transfer or obligation was to an insider;

- the transfer or obligation was concealed;

- the transfer was of substantially all the debtor's assets;

- the debtor removed or concealed assets;

- the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

- the transfer occurred shortly before or shortly after a substantial debt was incurred.

37

161.    The improper transfer of SED's funds by Home Servicing, as found by the North Carolina Superior Court, also constitutes fraudulent transfers: "Home Servicing, LLC willfully transferred, or participated in a scheme to transfer, proceeds from the disposition of the loans sold to SED, and from monies collected on the loans sold to SED" and "willfully transferred to itself, or paid itself fees, or withdrew funds, that originated from proceeds from the disposition of the loans sold to SED on June 20, 2014, and from monies collected on the loans sold to SED."  Civil Contempt Order, Case 17-03150, Doc. 10-3.

162.    Due to these Defendants' actions, SED suffered significant financial harm.  SED is entitled to avoidance of the transfers or obligations; an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code; or subject to applicable principles of equity and in accordance with applicable rules of civil procedure: an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property; appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or any other relief the circumstances may require.

### FIFTH CLAIM FOR RELIEF
**(Negligent Misrepresentation – Hyland, Johnson, 3 Star, TM Property, TMPS, Biltmore, Home Servicing, Brown & Associates, Dykes, Caballero, St. John and The Nations Law Firm)**

163.    All preceding paragraphs are incorporated by reference.

164.    SED, pleading in the alternative, asserts that in the event that Defendants' misrepresentations and concealments described above were not made with the intent to deceive, they were made with reckless disregard for the truth and with negligence towards the truth.

165.    Each of the Defendants understood that SED would be relying on their statements and representations (and omissions) regarding the loans and the loan files, and in fact, the

representations (and/or concealments) at issue were directed towards SED with the intent that SED rely on them.

166.    SED justifiably and reasonable relied on the statements and concealments and suffered significant financial injury as described herein as a result.

## SIXTH CLAIM FOR RELIEF
### (Texas Theft Liability Act – Hyland, Johnson, 3 Star, TM Property, TMPS, Biltmore, Dykes and The Nations Law Firm)

167.    All preceding paragraphs are incorporated by reference.

168.    The Texas Theft Liability Act (the "TLA") is encoded at Sections 134.001-134.005 of the Texas Civil Practice and Remedies Code. The TLA provides that "[a] person who commits theft is liable for the damages resulting from the theft."[5]  Further, the TLA states that "a person who has sustained damages resulting from theft" can recover "from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1000" as well as "court costs and reasonable and necessary attorney's fees."[6]

169.    The elements of a cause of action for theft of property under the TLA are: (1) demonstrating plaintiff's possessory right to the property, (2) defendant's unlawful appropriation of the property by taking it without the plaintiff's effective consent, (3) defendant's intent to deprive, and (4) the theft caused damages to the plaintiff.[7]

170.    SED has a possessory right to the $4,000,000 it paid 3 Star (through Dykes at The Nations Law Firm) that now resides with Defendants and/or other insiders or affiliates of

---

[5]  TEX. CIV. PRAC. & REM. CODE ANN. § 134.003(a) (defining "theft" to include theft of real or personal property under the Texas Penal Code).

[6]  *Id.* § 134.003(a), § 134.005(a)(1), (b).

[7]  *See, e.g., First State Bank, NA v. Morse*, 227 S.W.3d 820, 826 (Tex. App.–Amarillo 2007, no pet.); *Rowland v. State*, 744 S.W.2d 610, 611 (Tex. Crim. App. 1988).

Defendants. Defendants misappropriated and enjoyed these monies knowing full well they and the others to whom the monies were funneled were not entitled to same. All of this was done without the consent of SED. These Defendants intended to and in fact did deprive SED of these monies which led SED to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Contract – 3 Star)

171.    All preceding paragraphs are incorporated by reference.

172.    SED makes this claim in the alternative to the claim for fraudulent inducement.

173.    In the event that the LSA and Note are enforceable, 3 Star materially breached the LSA and Note in the following ways: (1) 3 Star failed to refund or credit the loans put back on August 1, 2012 after 3 Star failed to cure. LSA¶ 1.g; (2) 3 Star failed to refund or credit against the loans put back on November 11, 2012. LSA¶ 1.g; (3) In LSA¶ 1.g, 3 Star represented that it was the sole owner of the loans and that nobody else had an interest in them, including a security interest, which proved to be false; (4) In LSA¶ 2, 3 Star represented that it would turn over the loan files to Brown & Associates, which it did not; (5) 3 Star failed to use its "best efforts" under LSA ¶ 1.f to sell loans by July 11, 2014; (6) the majority of the Loans were not compliant with industry standard, did not comport with SED's business model, and were not valuable, contrary to 3 Star's representations.

174.    SED is entitled to rescission of the LSA and Note, plus damages to compensate it for its losses not remedied by rescission, which include $4,000,000 in monies payed out, time spent trying to discover and cure the loans, and money spent on outside consultants to review the loan files.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Contract and Breach of Fiduciary Duty – Home Servicing)

175.    All preceding paragraphs are incorporated by reference.

176.    SED has a contract with Home Servicing.  The contract is either implied, or SED has succeeded TMPS LLC under the terms of the written contract between TMPS LLC and Home Servicing dated September 3, 2013.

177.    In an affidavit filed in this case, George Caballero confirmed the existence of a contract with SED as follows: "*Either Jim or Chris asked if they could sign a new servicing agreement with Home Servicing on these loans and it was clearly stated that we would not execute a new agreement; the loans would be serviced under the existing agreement with TM.  All parties agree that Home Servicing was servicing the loans on a short term basis as the loans were supposed to be sold immediately and service released from HS.  They acknowledged that they had reviewed our servicing agreement which outlined our services and fees.*"

178.    Under the terms of the contract, Home Servicing agreed to take orders from SED regarding the Loans and not to foreclose on or sell any of the collateral without instruction from SED to do so.

179.    Under the terms of the contract, Home Servicing set up an escrow account to hold any funds collected on the loans for the benefit of SED.  Home Servicing was also granted a limited Power of Attorney to act as SED's true and lawful attorney-in-fact.  As SED's attorney-in-fact, Home Servicing owes SED a fiduciary duty.

180.    At the July 14, 2014 meeting at Home Servicing, SED informed Home Servicing that it was not authorized to foreclose on loans or sell loans or take any other action without SED's instruction and consent.  Home Servicing agreed.  Later, on August 11, 2014, SED again informed

Home Servicing by email that it was not authorized to foreclose on loans or sell loans or take any other action without SED's instruction and consent.  Home Servicing agreed.

181.    Later, SED learned that Home Servicing had, for a number of loans that SED purchased, by virtue of its limited Power of Attorney with SED, sold the notes, allowed a short payoff, or foreclosed and sold the collateral, without SED's knowledge or instruction.  Upon information and belief, the proceeds from those sales are currently being held by Home Servicing. In so doing, Home Servicing is in breach of its contractual obligations to SED.

182.    After SED learned that Home Servicing sold notes, allowed short payoffs, or foreclosed on loans and sold collateral without its approval, SED's counsel sent a letter to Home Servicing on October 22, 2014 demanding that Home Servicing cease any such actions.  Home Servicing did not respond to the allegations that it had disposed of loans without SED's approval.

183.    On December 4, 2014, after learning of the filing of the Complaint in this case, Home Servicing sent SED a report of its actions in connection with the loans.  That report shows that Home Servicing had received net proceeds in November 2014 of $17,240.50, in October 2014 of $41,674.60, in September 2014 of $86,129.30, in August 2014 of $58,602.95, and in July 2015 of $21,105.03 as a result of servicing and/or disposition of some of the loans.  Those proceeds reveal that Home Servicing has been disposing of loans that SED purchased, and SED has never given consent for it to sell any loans.  That report also shows that Home Servicing has been paying itself from the proceeds without SED's knowledge or permission and without providing a proper reconciliation.

184.    Home Servicing has also charged SED a fee for servicing loans other than the 1,235 Loans, in violation of the contract between SED and Home Servicing.  This is a breach of contract and breach of fiduciary duty.

185.    Since the filing of this lawsuit, and in violation of the Temporary Restraining Order and Preliminary Injunction, Home Servicing has paid itself more than $250,000 from SED's funds held in escrow.   The on-going payments to itself not only violate the Court's Order, blatantly breach the fiduciary duties owed to SED, but also violate the contractual obligations to SED.

186.    SED has also asked Home Servicing multiple times for a reconciliation of funds into and out of Home Servicing in relation to the loans, and for a report detailing exactly which of the loans Home Servicing is servicing and charging fees for, but Home Servicing has failed to provide such information in a suitable format—that is, a format that SED can understand.   This is a breach of fiduciary duty and a breach of the contractual obligations to SED.

187.    SED is entitled to damages for these breaches.   As to the breaches of fiduciary duty, SED is entitled to actual damages, exemplary damages, a constructive trust, fee forfeiture and profit disgorgement.

### NINTH CLAIM FOR RELIEF
**(Breach of Contract and Breach of Fiduciary Duty - Brown & Associates)**

188.    All preceding paragraphs are incorporated by reference.

189.    SED has a Services Contract and Confidentiality Agreement with Brown & Associates.

190.    Under the Services Contract, Brown & Associates was required to perform all services in a workmanlike and professional manner.   It failed to do so.

191.    SED requested the transfer of the 1235 loans from Brown & Associates in order to sell the available assets before the assets continued to waste away in value.   In violation of the Services Contract and Confidentiality Agreement, Brown & Associates refused to provide the files on the 1235 loans or refused to provide a commitment to transfer the files upon the sale by SED. Brown & Associates knew that SED would be precluded from selling the legitimate assets without

possession of the original files or without the necessary commitment to transfer the files.  The actions by Brown & Associates prevented the legitimate sale of loans by SED and this has caused financial damages to SED.

192.    Brown & Associates breached the Services Contract, as outlined above, including the following:

- Brown & Associates failed to treat SED as its client under the Services Agreement despite the fact that the Services Agreement was the most recent contract for services executed by Brown & Associates on any of the 1235 loans.

- Brown & Associates failed to provide timely updates to SED regarding the curative process, failed to convey information on the condition of each loan in the 1235 loans despite the fact that Brown & Associates understood time was of the essence for SED and as requested by SED and failed to provide timely updates to SED on the discovery of loans that had been long released, loans which SED purchased from 3 Star.

- Brown & Associates failed to provide timely information on the true ownership of the loans that made up the 1235 loans.

- At least as early as August, Brown & Associates discovered that at least 9 of the loans previously in the Biltmore Funding II group of loans were never sold by Biltmore Funding II to 3 Star and that Brown & Associates continued to work with Biltmore Funding II on these files despite the fact that SED had paid approximately $90,000 for these 9 loans.

- Without any authorization, and without providing full disclosure to SED, Brown & Associates continued to do work for Biltmore Funding II and failed to disclose to SED the work being performed for Biltmore Funding II.

- Brown & Associates continued to perform work for the previous sellers (TMPS, Biltmore Funding, and Biltmore Funding II) without disclosing this information to SED, took instructions from the previous sellers in violation of its contractual obligations to SED and did so in violation of its own internal procedures.

- Pursuant to the Services Contract with SED, Brown & Associates failed to perform its duties in a workmanlike and professional manner.

- Pursuant to the Services Contract with SED, Brown & Associates failed to properly store, manage, and maintain the 1235 files.

- Brown & Associates provided active assistance and cooperation to Defendants James Johnson, 3 Star, Mark Hyland, and TMPS in the lawsuit in December 2014 and January 2015 in violation of the duties to its client SED under the Services Contract.

- In violation of the Services Contract, Brown & Associates refused to provide the files on the 1235 Loans or refused to provide a commitment to transfer the files upon the sale by SED.

193.    Brown & Associates, through the Services Contract and Confidentiality Agreement was placed in a position of trust and confidence with SED's proprietary, confidential information. Brown & Associates was duty bound, via contract, to protect that information.  However, Brown & Associates, by virtue of its establishing dominion and control over SED's confidential information also owed SED fiduciary duties with respect to same.

194.    Brown & Associates breached its fiduciary duties and duties under the Confidentiality Agreement as outlined above and including the following:

- At least as early as August 2014, Brown & Associates discovered that at least 9 of the loans previously in the Biltmore Funding II group of loans were never sold by Biltmore Funding II to 3 Star and that Brown & Associates continued to work with Biltmore Funding II on these files despite the fact that SED had paid approximately $90,000 for these 9 loans.

- Without any authorization, and without providing full disclosure to SED, Brown & Associates continued to do work for Biltmore Funding II, provided Confidential Information to Biltmore Funding II, and failed to disclose to SED the work being performed for Biltmore Funding II.

- Brown & Associates continued to perform work for the previous sellers (TMPS, Biltmore Funding, and Biltmore Funding II) without disclosing this information to SED, provided Confidential Information and took instructions from the previous sellers in violation of its contractual obligations to SED.

- Brown & Associates provided active assistance and cooperation to Defendants James Johnson, 3 Star, Mark Hyland, and TMPS in the lawsuit in December 2014 and January 2015 in violation of the duties to its client SED under the Confidentiality Agreement.

- In violation of the Confidentiality Agreement, Brown & Associates refused to provide the files on the 1235 loans or refused to provide a commitment to transfer the files upon the sale by SED.

- Brown & Associates engaged in improper communications with potential buyers in December 2014, provided third parties with Confidential Information of SED, all in violation of the Confidentiality Agreement.

- After learning of both the purported default letter issued by 3 Star against SED and the lawsuit filed by SED in December 2014, Brown & Associates provided confidential information to Mark Hyland in the form of an updated spreadsheet on the 1235 loans in violation of the duties and obligations set forth under the Confidentiality Agreement.

195.    Brown & Associates improperly disclosed Confidential Information of SED, used the Confidential Information of SED for its own purposes and used the Confidential Information of SED for the benefit of others in violation of the Confidentiality Agreement and in breach of its fiduciary duties.

196.    Brown & Associates failed to properly protect the Confidential Information of SED.

197.    As set forth above, Brown & Associates used the Confidential Information of SED and disclosed the Confidential Information of SED to the detriment of SED in violation of the NON CIRCUMVENT provision of the Confidentiality Agreement.

198.    Pursuant to the terms of the Confidentiality Agreement, Brown & Associates agreed, at any time requested by SED, to "deliver promptly" to SED all Confidential Information, which includes all information on the 1235 loans maintained by Brown & Associates. As outlined above, when requested to do so, Brown & Associates refused to deliver promptly the Confidential Information of SED in violation of the Confidentiality Agreement and in contravention of its fiduciary duty to SED.

199.    Pursuant to the terms of the Confidentiality Agreement, Brown & Associates agreed "to defend, indemnify and hold harmless" SED "from any and all loss, damage, liability,

and legal fees (including but not limited to, reasonable fees and disbursements of counsel incurred by" SED "in any action or proceeding between a Disclosing Party Entity and the Receiving Party or between a Disclosing Party Entity and any third party related to this Agreement) resulting from a breach of any obligation contained in this Agreement by the Receiving Party, and Representative or any person, firm, or entity to whom the Receiving Party revealed or provided access to or use of the Confidential Information."

200.    SED hereby makes a demand on Brown & Associates for indemnity pursuant to the terms of the Confidentiality Agreement for breaches of the Confidentiality Agreement.

201.    Brown & Associates further breached these contracts by treating Hyland as the client and not SED.

202.    SED is entitled to damages from Brown & Associates for its breaches of contract. As to the breaches of fiduciary duty, SED is entitled to actual damages, exemplary damages, a constructive trust, fee forfeiture and profit disgorgement.

## TENTH CLAIM FOR RELIEF
### (Breach of Contract as to Mark E. Dykes and Breach of Fiduciary Duty as to Mark E. Dykes and The Nations Law Firm)

203.    All preceding paragraphs are incorporated by reference.

204.    SED entered into an Escrow Agreement with Mark E. Dykes of The Nations Law Firm.

205.    Mark E. Dykes owes a fiduciary duty to SED, as escrow agents owe a fiduciary duty to those with whom they enter an escrow agreement.  Dykes performed his escrow duties and obligations, and breaches of same, during the course of his employment and/or agency with The Nations Law Firm.

206.     Pursuant to the escrow agreement Dykes could only distribute the first $4,000,000 of SED's funds to 3 Star, no one else.

207.     Although Dykes represented that he only distributed these funds to 3 Star, and provided SED with his "SED, LLC Accounting Ledger" that reflected same, on May 15, 2017, Dykes (in correspondence with Rhonda Chandler, counsel for the Trustee) admitted that he never distributed SED's $4,000,000 to 3 Star, but he surreptitiously distributed the funds to Hyland's affiliates, intentionally hiding that fact from SED.   Hiding this fact from SED since 2014 is a breach of contract and a colossal breach of Dykes' fiduciary duty to SED.

208.     SED is entitled to damages for these breaches.  As to the breaches of fiduciary duty, SED is entitled to actual damages, exemplary damages, a constructive trust, fee forfeiture and profit disgorgement.

## ELEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment and Money Had and Received – Hyland, Johnson, 3 Star, TM Property, TMPS, Biltmore and Home Servicing)

209.     All preceding paragraphs are incorporated by reference.

210.     As a result of these Defendants' tortious conduct, Defendants were unjustly enriched as set forth above.

211.     These Defendants hold hundreds of thousands of dollars of SED's money.  In both equity and good conscience this money belongs to SED.

212.     These Defendants have refused to repay SED and now actually take the position that they are entitled to SED's money and should be awarded legal title to the loans and/or all proceeds from the sale of said loans.

213.     Through their actions, TM Property and Biltmore have been unjustly enriched and as a result SED has suffered actual damage.

## TWELFTH CLAIM FOR RELIEF
### (Civil Conspiracy and/or Assisting, Encouraging and/or Participating – All Defendants)

214.    All preceding paragraphs are incorporated by reference.

215.    In Texas, parties involved in a conspiracy are responsible for the actions of their co-conspirators, and liability is extended throughout the entire conspiracy.[8] The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[9]

216.    Defendants, in combination with one another, reached an agreement to swindle SED out of at least $4,000,000 for a package of bogus loans.  Defendants acted wrongfully (by defrauding SED and breaching fiduciary duties owed SED) and in concert with one another to unlawfully harm SED, thereby causing damages to SED.

## THIRTEENTH CLAIM FOR RELIEF
### (Constructive Trust – All Defendants)

217.    All preceding paragraphs are incorporated by reference.

218.    Defendants, working in concert with one another, defrauded SED out of millions of dollars and ownership of the loans.

219.    As a result of Defendants' chosen course of conduct, SED requests that the Court place every dollar received by any of these Defendants at any point in time from SED or from the sale (or proceeds) of any of the loans contemplated in the LSA, or that can be linked to SED or the loans in the LSA, in constructive trust. SED also requests that the Court impose a constructive

---

[8] *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).

[9] *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 164 (Tex. App.— Houston [14th Dist.] 2000, pet. denied).

trust over loans sold through 3 Star's bankruptcy and the proceeds thereof for the benefit of SED and to prevent the unjust enrichment of Defendants.

### FOURTEENTH CLAIM FOR RELIEF
**(Negligence – Home Servicing, Brown & Associates, Dykes, Caballero, St. John and The Nations Law Firm)**

220.     All preceding paragraphs are incorporated by reference.

221.     Each of these Defendants was entrusted with SED's property, whether that be loans owned by SED, SED's funds, or funds paid to these Defendants for or related to SED's loans.

222.     To the extent these Defendants were merely innocent players in the Con, each still owed SED duties and wholly failed to exercise reasonable care in the performance of such duty, causing significant harm to SED (Home Servicing and The Nations Law Firm are liable for the neglect of Caballero and St. John on the one hand, and Dykes, respectively, their principals, employees and agents).  Additionally, each of these Defendants failed to act in the manner in which a professional of ordinary prudence in their particular field would or would not have acted under the same or similar circumstances.

223.     SED is therefore entitled to damages resulting from these Defendants' negligent acts and/or omissions.

### FIFTEENTH CLAIM FOR RELIEF
**(Objection to Claims Asserted by Biltmore and TM Property)**

224.     All preceding paragraphs are incorporated by reference.

225.     Biltmore filed Proof of Claim 4-1 in Bankruptcy Case No. 16-34185 (the "Bankruptcy Case") which asserts a total claim in the amount of $3,636,810.17 and secured claim in the amount of $2,805,000.00 (the "Biltmore Claim").  Biltmore claims that the basis of its secured claim is a "Purchase Money Secured Loan" and that its claim is secured via TEX. BUS. & COM. CODE § 9.313.

226.     Objection No. 1 to Biltmore Claim (Inconsistent with 3 Star's Schedules).   SED objects to the Biltmore Claim on the grounds that the principal amount that Biltmore alleges is owed by 3 Star to Biltmore does not match the amount alleged by Biltmore in 3 Star's filed bankruptcy schedules.

227.     Objection No. 2 to Biltmore Claim (Collateral Not Identified).   SED objects to the Biltmore Claim on the grounds that Biltmore fails to identify what property of 3 Star is allegedly encumbered by Biltmore's alleged secured claim.

228.     Objection No. 3 to Biltmore Claim (Failure to Perfect Alleged Secured Interest). SED objects to the Biltmore Claim on the grounds that Biltmore failed to perfect its alleged security interest under TEX. BUS. & COM. CODE § 9.313 or any other allowed method.

229.     Objection No. 4 to Biltmore Claim (Improper Interest Calculations).   SED objects to the Biltmore Claim on the grounds that Biltmore failed to properly calculate the pre-bankruptcy petition interest it is allegedly owed.

230.     TM Property filed Proof of Claim 5-1 in the Bankruptcy Case which asserts a total claim in the amount of $2,832,887.30 and secured claim in the amount of $2,805,000.00 (the "TM Property Claim").   TM Property claims that the basis of its claim is a "Purchase Money Secured Loan" and that its claim is secured via TEX. BUS. & COM. CODE § 9.313.

231.     Objection No. 1 to TM Property Claim (Inconsistent with 3 Star's Schedules).   SED objects to the TM Property Claim on the grounds that the principal amount that TM Property alleges is owed by 3 Star to TM Property does not match the amount alleged by 3 Star in 3 Star's filed bankruptcy schedules.

232.     Objection No. 2 to TM Property Claim (Collateral Not Identified).  SED objects to the TM Property Claim on the grounds that TM Property fails to identify what property of 3 Star is allegedly encumbered by TM Property's alleged secured claim.

233.     Objection No. 3 to TM Property Claim (Failure to Perfect Alleged Secured Interest).  SED objects to the TM Property Claim on the grounds that TM Property failed to perfect its alleged security interest under TEX. BUS. & COM. CODE § 9.313 or any other allowed method.

234.     Objection No. 4 to TM Property Claim (Improper Interest Calculations).  SED objects to the TM Property Claim on the grounds that TM Property failed to properly calculate the pre-bankruptcy petition interest it is allegedly owed.

235.     SED further objects to the amount of the TM Property and Biltmore Claims to the extent that TM Property and/or Biltmore received (i) property from 3 Star which is recoverable under 11 U.S.C. § 550 or (ii) transfers that are avoidable under 11 U.S.C. §§ 544.

## SIXTEENTH CLAIM FOR RELIEF
### (Equitable Subordination of Claims Asserted by TM Property and Biltmore)

236.     All preceding paragraphs are incorporated by reference.

237.     As described in detail above, 3 Star, TM Property, Biltmore, Hyland and others conspired to defraud SED out of millions of dollars via the fraudulent sale of 1,235 non-performing mortgage loans.  The Biltmore and TM Property Claims arise out of this fraudulent transaction and course of conduct.  Accordingly, SED seeks subordination of the Biltmore and TM Property Claims and all liens and/or security interests relating to the Biltmore and TM Property Claims to all other claims in the Bankruptcy Case, with the exception of equity, under 11 U.S.C. § 510(c).

## V.
## CONDITIONS PRECEDENT

238.    All conditions precedent to SED's claims for relief, including presentment of attorneys' fees, have been performed, have been waived or have occurred.

## VI.
## DAMAGES

239.    In light of Defendants' conduct, SED has directly and proximately suffered actual, special, and consequential damages, as well as lost profits that are within the jurisdictional limits of this Court.  SED is also entitled to recover punitive or exemplary damages pursuant to the Texas Civil Practice and Remedies Code and Texas common law.

240.    As permitted under all applicable law, SED seeks the recovery of all attorneys' fees incurred in connection with the prosecution of its claims for TLA violations.  SED also seeks attorneys' fees pursuant to i) the express terms of the contracts breached by Defendants; ii) § 38.001 of the Texas Civil Practices & Remedies Code; iii) UFTA, TEX. BUS. & COM. CODE §24.013; and/or iv) TLA, TEX. CIV. PRAC. & REM. CODE §134.005(b).

## PRAYER

WHEREFORE SED respectfully prays that judgment be entered in favor of SED against Defendants for all damages and amounts to which SED is entitled, a constructive trust, any amounts allowable under law for pre-judgment interest, post-judgment interest, attorneys' fees, and court costs; SED also prays that court costs and discretionary costs of this action be taxed against Defendants; SED further prays for such further relief, at law or in equity, to which SED may show itself justly entitled.

Respectfully submitted,

LEVINTHAL • WILKINS, PLLC


By: */s/ Jared I. Levinthal*
       Jared I. Levinthal
       Texas State Bar No. 24002467
       levinthal@levinthalwilkins.com
       2323 S. Shepherd Dr., Suite 1000
       Houston, TX  77019
       (713) 275-9700 Telephone
       (713) 275-9701 Facsimile

       Douglas W. Hanna
       North Carolina State Bar No. 18225
       dhanna@ghslawfirm.com
       GRAEBE HANNA & SULLIVAN, PLLC
       4350 Lassiter at N. Hills Ave., Suite 375
       Raleigh, NC  27609
       (919) 863-9090 Telephone
       (919) 863-9095 Facsimile

       Blake Hamm
       Texas State Bar No. 24069869
       blakehamm@snowspencelaw.com
       SNOW SPENCE GREEN LLP
       2929 Allen Parkway, Suite 2800
       Houston, TX  77019
       (713) 335-4800 Telephone
       (713) 335-4848 Facsimile

**ATTORNEYS FOR SED HOLDINGS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2017, a true and correct copy of the foregoing was served by ECF and/or first class, prepaid U.S. Mail to the parties listed below:

R. Hayes Hofler, III
ATTORNEY AT LAW
1007 Vickers Avenue
Durham, North Carolina 27707

Sean Michael Reagan
LEYH PAYNE, LLP
9545 Katy Freeway, Suite 200
Houston, Texas 77024

Stephen Edward McCleery
LEYH PAYNE, LLP
9545 Katy Freeway, Suite 200
Houston, Texas 77024

Brian B. Kilpatrick
WILSON CRIBBS & GOREN, P.C.
2500 Fannin Street
Houston, Texas 77002

Todd C. Collins
TAYLOR TAYLOR & RUSSELL
2777 Allen Parkway, Suite 1000
Houston, Texas 77019

Gary Leonard Pate
MARTIN DISIERE JEFFERSON & WISDOM
808 Travis Street, 20th Floor
Houston, Texas 77002

Rhonda R. Chandler
HUGHES WATTERS ASKANASE
Total Plaza
1201 Louisiana Street, 28th Floor
Houston, Texas 77002

John W. Havins
2211 NORFOLK ST., SUITE 525
Houston, Texas 77098

Warren E. Johnsey
ATTORNEY AT LAW
1615 Emerald Lake Court
Houston, Texas 77062

/s/ Jared I. Levinthal
Jared I. Levinthal